## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| HECTOR G. IBARRA-MONTUFAR, | ) | |
| | ) | **No. 12 CV 736** |
| Plaintiff, | ) | |
| v. | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner, Social Security | ) | |
| Administration,[1] | ) | |
| | ) | **May 30, 2013** |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION and ORDER

In April 2009 Plaintiff Hector G. Ibarra-Montufar ("Ibarra-Montufar") applied for Disability Insurance Benefits ("DIB") under sections 216(i) and 223(d) of the Social Security Act. The Commissioner of the Social Security Administration denied his application for benefits. Ibarra-Montufar now challenges the denial and asks the court to either reverse this decision or remand the case for further proceedings. For the following reasons, Ibarra-Montufar's motion is granted to the extent it seeks a remand:

### Procedural History

Ibarra-Montufar applied for DIB on April 28, 2009, claiming that he became disabled on January 3, 2008, as a result of degenerative disc disease. (Administrative Record ("A.R.") 102-03.) The Commissioner denied Ibarra-Montufar's claims on July 30, 2009, (id. at 54), and then again on reconsideration on

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin—who became the Acting Commissioner of Social Security on February 14, 2013—is automatically substituted as the named defendant.

October 22, 2009, (id. at 60). Ibarra-Montufar requested a hearing before an administrative law judge ("ALJ"), and this request was granted on June 7, 2010. (Id. at 66.) On July 28, 2010, the ALJ conducted a hearing, after which he concluded that Ibarra-Montufar is not disabled as defined by the Social Security Act. (Id. at 20-27.) The Appeals Council denied Ibarra-Montufar's request for review on December 2, 2011, (id. at 1), thereby rendering the ALJ's decision the final decision of the Commissioner, *see Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012). Ibarra-Montufar initiated this civil action for judicial review of the Commissioner's final decision, *see* 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of this court, *see* 28 U.S.C. § 636(c).

## Facts

Ibarra-Montufar, who is 47 years old, has struggled for over a decade with back pain and has undergone numerous pain-blocking injections and surgeries, including the implantation of a spinal cord stimulator. Prior to January 3, 2008, Ibarra-Montufar worked as a medical supplies warehouse picker, but he has not worked since that date. A native of Guatemala, he speaks limited English—he spoke Spanish at his last job. Ibarra-Montufar maintains that he is unable to work on account of his back pain, which requires him to lie down frequently and to constantly shift positions. Further, he claims that he suffers from leg numbness, poor concentration, and an inability to reach. At the hearing before the ALJ, Ibarra-Montufar presented both documentary and testimonial evidence in support of his claim.

### A. Medical Evidence

The medical record establishes that in April 2000, Ibarra-Montufar first sought medical treatment for lower back and leg pain from Dr. Elena Gragasin and Dr. Linda Dew. (A.R. 287.) Dr. Dew referred him for an MRI of his lumbar spine. (Id.) The findings from this test were "L4-L5 dis[c] desiccation with minimal diffuse posterior disk bulging," and "L5-S1 dis[c] desiccation with minimal diffuse posterior dis[c] bulging." (Id. at 287.) Repeat MRIs of his lumbar spine were performed in 2003 after Ibarra-Montufar complained to Dr. James Adamson of low back pain radiating to both legs. (Id. at 284, 290.) Again, these MRIs found problems at L4-5 and L5-S1, culminating with a diagnosis that included bulging, herniation, degenerative disc disease, and possible disc protrusion. (Id. at 282-84.) Dr. Adamson repeatedly administered epidural steroid injections but these failed to give Ibarra-Montufar prolonged relief. (Id. at 276.)

Ibarra-Montufar underwent bilateral L5-S1 spinal surgery in February 2004 to repair the L5-S1 herniated disc. (Id. at 273-76.) Three months later, Dr. Adamson opined that Ibarra-Montufar could return to "light" work subject to a 15-pound lifting restriction and the ability to take breaks. (Id. at 322.) Ibarra-Montufar did so but experienced severe back and thigh pain, necessitating another MRI of the lumbar spine. (Id. at 277.) This MRI showed numerous problems, including post-operative multi-level disc degeneration, bulging, degenerative spondylosis, facet arthropathy, post-operative fibrosis changes, and signal abnormalities involving L3-L4, L4-L5 and L5-S1. (Id. at 277-78.)

3

Throughout 2005 Ibarra-Montufar continued to see Dr. Adamson and a pain specialist, Dr. Anatoly Arber, for ongoing pain in his lower back and thighs. (Id. at 242.) After conservative therapies such as physical therapy and epidural injections failed to bring relief, Dr. Adamson felt that Ibarra-Montufar was no longer a good candidate for further "open" surgery and recommended instead the surgical implantation of a spinal cord stimulator. (Id. at 239-43.) Drs. Arber and Adamson performed this surgery in January 2006. (Id. at 239, 267.) A few weeks after surgery, Ibarra-Montufar visited Dr. Arber, who noted that "[t]he stimulator is providing excellent relief of his symptoms in the lower extremities. He has good strength and sensation in his lower extremities." (Id. at 237.) Dr. Arber further stated that Ibarra-Montufar was free to return to work but should not lift anything or twist his lower back for six weeks. (Id.)

In December 2007 Dr. Arber helped Ibarra-Montufar fill out a Work Readiness Assessment Form for his employer, Medline Industries, Inc. (Id. at 384-85.) Dr. Arber found Ibarra-Montufar able to return to work for a full 40-hour work week but restricted him to lifting, carrying, pushing, and pulling no more than 20-40 pounds. (Id.) Ibarra-Montufar was also to limit repetitive movements, particularly reaching and stretching, to avoid displacing his stimulator electrodes. (Id. at 385.) Ibarra-Montufar's Disability Certificate, signed by Dr. Arber and valid for two spans of time—between April and October 2007 and then again between December 2007 and June 2008—cleared him to return to "light" duty with a 40-pound lifting, pushing, or pulling limit and no forklift driving. (Id. at 386-87.) At

4

Ibarra-Montufar's employer's request, Dr. Adamson filled out a Health Care Provider Certification with the objective of determining the full extent of Ibarra-Montufar's disability.  (Id. at 380.)  Dr. Adamson listed Ibarra-Montufar's diagnosis as "fail back syndrome" with "[left] lumbar radiculopathy" and rated his condition a five out of a possible six on the sliding "serious health condition" scale under the Family and Medical Leave Act.  (Id.)  The form lists Ibarra-Montufar's prognosis as having "achieved maximum recovery" and identifies the following restrictions:  up to 35 pounds lifting and pulling; no more than "seldom" (0-6%) climbing; no more than "occasional" (0-33%) lifting, pulling and bending/stooping; no more than "frequent" (34-66%) repetitive work; and no restriction on sitting.  (Id. at 381.)

In April 2008 Ibarra-Montufar underwent a Functional Capacity Evaluation to determine his current abilities as compared to his employment demands.  (Id. at 466.)  The evaluation was conducted by an occupational and a physical therapist and lasted almost four hours.  (Id.)  Ibarra-Montufar was allowed to take breaks as needed during the evaluation.  (Id.)  The therapists concluded that Ibarra-Montufar could perform "light" work with the additional limitation of only infrequent lifting of 10 pounds to shelf height, 30 pounds from floor to waist height, and 40 pounds at waist height.  (Id. at 469.)  He could stand in one spot for 8-18 minutes before needing to walk around, and then could walk for 14-32 minutes before needing to sit.  (Id.)  He was able to perform actions below the waist without a problem—although the evaluation then states that he did so with "reports of increasing low back pain."  (Id.)  He was able to reach forward without difficulty but immediately

felt pain when reaching overhead, especially with both hands. (Id.) The report listed "subjective data" of "moderate to intense discomfort in [the] low back area" and "nominal generalized fatigue." (Id. at 468.) The "cooperation/level of effort" portion stated that Ibarra-Montufar had a "cooperative manner," that he exerted "maximal and consistent/valid effort," and showed a "willingness to attempt new activities or increased weights." (Id.) Ibarra-Montufar's grip strength was below the 10th percentile for his right upper arm and at the 15th percentile for his left. (Id. at 467.) Finally, the report noted that "all activities were performed while using a spinal stimulator for pain control." (Id.)

In May 2009 Ibarra-Montufar completed a Social Security Administration Disability Report in connection with his claim for benefits. (Id. at 138.) On it, he stated that he stopped working on January 3, 2008, on account of pain. (Id.) In answer to the question of how his condition limits his ability to work, Ibarra-Montufar wrote:

> Unable to stand for longer than 5 minutes. Legs start tingling if standing for too long. Unable to walk for long distances, when walking turns pain stimulator up. Changes positions frequently, needs to change positions, shifts when sitting and laying down or will get up and walk for a few minutes and lay back down. Unable to lift and carry items. Unable to reach due to stimulator wiring. Constant pain. Pain makes concentration difficult. Becomes fatigued easily. Does not sleep well at night. Prior to pain pump, experienced ulcers and kidney stones from pain medications.

(Id.) In July 2009 Dr. Scott Kale examined Ibarra-Montufar in connection with his disability claim. (Id. at 412-16.) Dr. Kale took an x-ray of Ibarra-Montufar's lumbar spine, which revealed the stimulator, but he found that "the joints

themselves appear to be unremarkable and not predictive of pain or dysfunction."

(Id. at 412.)  He also found that "the x-rays do not explain the basis of his pain and

do not show the fusion."  (Id.)  Dr. Kale noted his impressions of "chronic failed low

back syndrome," and obesity and found Ibarra-Montufar's cooperation and effort to

be "excellent."  (Id. at 416.)  Dr. Kale also noted Ibarra-Montufar's complaint that

despite the stimulator and his medications of Darvocet and Motrin, he continues to

experience pain of seven or eight out of ten, and that lifting, standing, bending, and

prolonged sitting will increase the pain to a ten out of ten.  (Id. at 413.)  Ibarra-

Montufar also reported that he was unable to lift 15 pounds without pain.  (Id.)

During the physical exam component of the evaluation, Ibarra-Montufar had

trouble getting on and off the exam table and was unable to squat or hop on one leg.

(Id. at 415.)  He had no trouble standing or walking on his toes or heels or tandem

walking.  (Id.)  His lumbar spine, however, demonstrated considerable loss of range

of motion:  his lumbar flexion was only 30 out of 60 possible degrees, and his degree

of extension and bilateral bending was only 5 out of 25 possible degrees.  (Id.)  He

also experienced a paravertebral muscle spasm during the exam.  (Id.)

State examiner Dr. Richard Bilinsky reviewed Ibarra-Montufar's record on

July 27, 2009, and determined that Ibarra-Montufar could lift 20 pounds

occasionally, 10 pounds frequently, could sit, stand, and/or walk with normal breaks

for about six hours of an eight-hour workday, could push and/or pull unlimited

amounts, and could perform light work with occasional stooping.  (Id. at 418-25.)

The only limitations Dr. Bilinsky included in his report were "occasional"

limitations on climbing ladders/ropes/scaffolds, stooping, crouching, and crawling; and "frequent" limitations on climbing ramps/stairs, balancing, and kneeling. (Id. at 420.) He placed no limits on Ibarra-Montufar's ability to reach. (Id. at 421.) He noted in his report that Ibarra-Montufar was able to do some work around the house, such as laundry, but that he has "problems in most physical areas." (Id. at 425.) He noted that Ibarra-Montufar is obese. (Id.) Dr. Bilinsky found Ibarra-Montufar to be "partially credible" as he observed few limitations at the exam and, per Dr. Kane's report, found no evidence of any lumbar fusion and only mild degenerative joint disease. (Id. at 425.) Dr. James Madison concurred with Dr. Bilinsky's assessment. (Id. at 429-31.)

At the end of 2009 Ibarra-Montufar bent over and hurt his back, causing him to experience greater pain, particularly in his right leg. (Id. at 446.) At that point in time, Ibarra-Montufar rated his pain as "horrible" and "hot-burning." (Id. at 456.) In January 2010 Dr. Arber opined that Ibarra-Montufar was incapable of even sedentary work. (Id. at 452.) Shortly thereafter, Drs. Arber and Adamson determined that Ibarra-Montufar's stimulator must have malfunctioned and suggested revision surgery. (Id. at 446.) Dr. Adamson described Ibarra-Montufar's pain as "intractable." (Id. at 503.) Revision surgery took place on April, 2, 2010. (Id. at 503-05.) Ibarra-Montufar returned to Dr. Adamson for a post-operative visit on April 5, 2010, at which time Dr. Adamson stated that "[s]ince we revised the spinal cord stimulator on Friday, 04/02, the patient has had good relief from the symptoms in his right leg. Objectively his sensory and motor examination is

8

normal." (Id. at 438.) The following week, Dr. Adamson commented that Ibarra-Montufar "continues to have good relief of the symptoms in his lower extremities." (Id. at 437.) Ibarra-Montufar filled out a Measurement of Pain questionnaire on April 20, 2010, wherein he described his pain as "discomforting," which is a two on a pain scale that spans from zero to five. (Id. at 435.) Dr. Arber's progress notes from that same date reflect Ibarra-Montufar's comment that "pain is better since replacement." (Id. at 436.)

## B. The ALJ Hearing

The ALJ conducted a hearing on July 28, 2010. At the hearing, Ibarra-Montufar described himself as being 5'7" tall and weighing 230 pounds. (Id. at 36.) He is a native of Guatemala with only a sixth-grade education. (Id. at 37.) Presently he lives with his wife and has two grown children. (Id. at 36-37.) Prior to January 2008, Ibarra-Montufar worked as a warehouse picker whose duties included packing medical supplies. (Id. at 38.) Ibarra-Montufar contends that he cannot work now because of pain in his lower back that radiates down his legs. (Id. at 38-39.) He states that his pain has gotten worse in the last year, that he has become forgetful, and that he has trouble sleeping. (Id. at 39.) He takes Tylenol III and Vicodin for his pain. (Id.) He does not do housework or cook on account of his pain, but he is able to shower or bathe and dress himself. (Id. at 40.) He occasionally drives to the store to pick up small items, although this hurts his back and is difficult because the stimulator causes his feet to feel numb. (Id. at 37, 40.) Ibarra-Montufar's daily morning routine is to wake-up, feed his birds and dogs,

smoke a cigarette outside, and then change positions frequently. (Id. at 40.) He does not have any friends because he cannot socialize. (Id. at 41.) He smokes 10 cigarettes a day. (Id.) He feels pain all the time and can stand for only about five minutes before he needs to sit down. (Id.) He can sit for about two to four minutes before he needs to stand up. (Id. at 42.) He lies down about four times a day for anywhere between 30 minutes and two hours. (Id. at 42-43.) Stairs are painful and he can walk only a half a block or less. (Id. at 40, 42.) He has trouble concentrating. (Id. at 43.) His chronic pain has also affected his family life because he cannot take care of his yard or help with household chores. (Id.)

The ALJ also took testimony from vocational expert ("VE") Thomas Gusloff, who testified that a hypothetical person who could "do the entire universe of exertional and non-exertional work"—but who is limited to lifting ten pounds occasionally, five pounds frequently, standing and walking two out of eight hours in divided periods, sitting six out of eight hours with a sit/stand option at will, occasional postural changes, no ladders, ropes, or scaffolds or exposure to vibrations, unprotected heights or dangerous moving equipment—would not be able to return to heavy work such as the type of work Ibarra-Montufar performed at the warehouse. (Id. at 44.) However, there would be other jobs he could perform: final assembler, bench assembly worker, preparer for plated ware, and touch-up screener. (Id. at 45.) Ibarra-Montufar's attorney asked the VE whether these jobs would remain if the hypothetical person were unable to stay "on task" for at least 30 minutes or were unable to sit for six hours during an eight hour workday. (Id. at

46.)  The VE opined that given the jobs' repetitive nature, it would be possible to be "off task" for a certain amount of time and still perform, and further, that these jobs could be performed while standing.  (Id.)

## C.  The ALJ's Decision

In evaluating Ibarra-Montufar's claim, the ALJ applied the five-step sequential inquiry for determining a disability, which required him to analyze:

> (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy.

*Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).  If at step three of this framework the ALJ finds that the claimant has a severe impairment that does not meet one of the impairments listed in Appendix 1, he must "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence."  20 C.F.R. § 404.1520(e).  A claimant's residual functional capacity ("RFC") is the quantification of what he can still do despite his limitations.  *Id*. at § 404.1545(a)(1).  The ALJ uses the RFC to determine at steps four and five whether the claimant can return to his past work or to different available work.  *Id*. at § 404.1520(f), (g).  It is the claimant's burden to prove that he has a severe impairment that prevents him from performing past relevant work.  *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000); 42 U.S.C. § 423(d)(2)(A).

Here, at steps one and two of the analysis the ALJ determined that Ibarra-Montufar has not engaged in substantial gainful activity since the application date of January 3, 2008, and that he suffers from one severe impairment: degenerative disc disease. (A.R. 22.) At step three, the ALJ declined to find that Ibarra-Montufar has an impairment that meets or equals one of the listed impairments in 20 C.F.R. § 404, Subpart P., Appendix 1. (Id.) The ALJ considered Ibarra-Montufar's degenerative disc disease under Listing 1.04 (disorders of the spine) but found no diagnostic evidence supporting the requirements of the Listing. (Id. at 24.)

Proceeding to step four, the ALJ determined that Ibarra-Montufar has the RFC to perform sedentary work in the workforce, subject to the following limitations:

> the claimant is unable to lift/carry more than 10 pounds occasionally and five pounds frequently; unable to stand and/or walk more than 2 hours out of an 8 hour workday, in divided periods; unable to sit for more than about 6 hours in an 8-hour workday, with a sit/stand option at will; unable to perform more than occasional posturals; unable to climb ladders, ropes or scaffolds; unable to work around unprotected heights or dangerous moving machinery; and unable to tolerate concentrated exposure to vibration.

(Id.) In making this determination, the ALJ concluded that although Ibarra-Montufar's disc disease could reasonably be expected to cause his alleged symptoms of chronic pain, his symptoms were out of proportion with the medical findings. (Id. at 25.) The ALJ also noted the absence of treating source opinion evidence indicating that Ibarra-Montufar is incapable of any level of work. (Id. at 25-26.) Finally, at step five the ALJ found that Ibarra-Montufar's RFC allows him to work as a final assembler, bench assembly worker, preparer for plated ware, or touch-up

screener for personal computer boards. (Id. at 27.) Accordingly, the ALJ concluded that Ibarra-Montufar is not under a disability as defined by the Social Security Act and denied his application for benefits. (Id.)

## Analysis

In his motion for summary judgment, Ibarra-Montufar challenges the ALJ's decision in five respects. First, Ibarra-Montufar argues that the ALJ failed to consider the effect of his obesity on his disc disease. Second, he argues that the ALJ's RFC analysis improperly excluded a discussion of his pain symptoms in contravention of SSR 96-8p. Third, Ibarra-Montufar maintains that the ALJ's credibility determination contravenes SSR 96-7p by using boilerplate language and failing to consider his testimony about his pain. Fourth, he contends that the ALJ cherry-picked from the April 2008 Functional Capacity Evaluation only that evidence supporting a non-disability finding. Fifth, Ibarra-Montufar argues that the ALJ erred in finding that he can perform a significant number of jobs that exist in the national economy.

This court confines its review to the reasons offered by the ALJ, *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.,* 318 U.S. 80, 93–95 (1943)), and examines whether the ALJ's decision is supported by substantial evidence, *Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir. 2010). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). This court may not

"reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford,* 227 F.3d at 869. We must affirm the ALJ's decision if reasonable minds could differ regarding whether the claimant is disabled. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). But remand is warranted if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," *Steele,* 290 F.3d at 940, or fails to "provide an accurate and logical bridge between the evidence and the conclusion that the claimant is not disabled," *Craft v. Astrue,* 539 F.3d 668, 673 (7th Cir. 2008) (internal quotations omitted).

## A.     The ALJ's Obesity Analysis

Ibarra-Montufar first argues that the ALJ failed to address the combined severity of his degenerative disc disease with his obesity. The Commissioner counters that Ibarra-Montufar neglected to assert what functional limitations he thinks result from his obesity. The Commissioner further points out that Ibarra-Montufar already is limited to sedentary work—the least exertional work level—and that Ibarra-Montufar has not identified any evidence indicating that he is in need of further restrictions.

Obesity is a complicated issue within the Social Security context because it does not have its own listing. *See* SSR 02-1p, 2002 WL 34686281, at *5 (Sept. 12, 2002). Even so, as explained in SSR 02-1p: "[o]besity . . . commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems." *Id*. at *3. Accordingly, it is possible for an obese

14

individual with multiple impairments, none of which meet or equal the requirements of a listing, to nonetheless have a "combination of impairments . . . equivalent in severity to a listed impairment." *Id*. at *5. ALJs are therefore obligated to take obesity into consideration when determining the total impact of a claimant's impairments. *Martinez v. Astrue*, 630 F.3d 693, 698-99 (7th Cir. 2001); *Clifford*, 227 F.3d at 873. This requirement is tempered, however, by the harmless error rule. Under that rule, even if it appears that an ALJ had not expressly considered a claimant's obesity, his failure to do so will be deemed harmless error where he "indirectly took obesity into account by adopting limitations suggested by physicians who were aware of or discussed [the claimant's] obesity." *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012); *see also Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006).

In this case, the ALJ did not count obesity among Ibarra-Montufar's severe impairments, and he did not expressly discuss whether his obesity, together with his disc disease, meets or medically equals a listed impairment. However, the ALJ mentioned Ibarra-Montufar's height of 5'7" and weight of 220 pounds, (A.R. 23), and he took into consideration the findings of several "State Agency doctors" when determining that Ibarra-Montufar is not disabled, (id. at 26). Drs. Kale and Bilinsky, both of whom are "State Agency" doctors, noted Ibarra-Montufar's obesity in their reports, (id. at 416, 425), and thus it reasonably can be inferred that the ALJ indirectly took obesity into account. *See Arnett*, 676 F.3d at 593. Ibarra-Montufar, for his part, fails to point to any evidence, other than the argument of his

counsel, suggesting that his obesity exacerbated his physical impairments. Accordingly, the court finds that any failure on the part of the ALJ to expressly discuss Ibarra-Montufar's obesity is harmless error. *See Prochaska*, 454 F.3d at 736-37 (finding harmless error where claimant failed to specify how obesity impaired his work ability and the ALJ implicitly considered claimant's condition in citing doctor's reports). But that being said, given this court's decision to remand this case for further proceedings, the presiding ALJ should take the time to examine the effect of Ibarra-Montufar's weight on his disc disease. *See, e.g., Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2006) (opining that obesity would necessarily amplify the effect of disc disease on a claimant's ability to stand and sit).

## B.    The ALJ's RFC Determination

Next Ibarra-Montufar claims that the ALJ's RFC assessment is erroneous because it is devoid of analysis concerning his pain, need to lie down, numbness, reaching difficulties, and concentration difficulties. The Commissioner maintains that the ALJ considered Ibarra-Montufar's allegations in his narrative and then explicitly discussed in his analysis Ibarra-Montufar's need to lie down throughout the day. As for Ibarra-Montufar's other issues, the Commissioner argues that the ALJ's decision to restrict him to sedentary work reasonably accommodates Ibarra-Montufar's other functional limitations.

In evaluating a claimant's RFC, an ALJ must consider all relevant medical and non-medical evidence. *See* 20 C.F.R. §§ 404.1545(a)(3). According to the Social Security regulations, the RFC assessment must appraise the claimant's abilities on

a function-by-function basis to determine the most an individual can do, despite his limitations, on a "regular and continuing basis," meaning essentially eight hours a day, five days a week. SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996); *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). Specifically:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96–8p at *7; *see also Villano v. Astrue,* 556 F.3d 558, 563 (7th Cir. 2009) (finding that an ALJ must evaluate all limitations that arise from a medically determinable impairment and may not ignore a line of evidence contrary to the ruling). With this standard in mind, the court agrees that the ALJ's RFC analysis leaves too many issues unaddressed and thus prevents meaningful review. The ALJ's conclusion that Ibarra-Montufar is capable of sedentary work (with certain additional modifications) possibly is the right conclusion. However, in arriving at this conclusion the ALJ ignored numerous symptoms and complaints and then quickly dispatched with minimal elaboration those he did entertain. For instance, he referred to: (1) the lack of a "treating source opinion" showing that Ibarra-Montufar is disabled; (2) the presence of other "evidence" showing that after the original spinal stimulator surgery in 2006, Ibarra-Montufar returned to light work

17

and only stopped in 2008 when the employer refused to continue accommodating his restrictions; (3) "evidence" from "his doctor" that he was unable to perform sedentary work prior to his second stimulator surgery in 2010 but that these restrictions ended after the stimulator revision surgery; (4) "a functional capacity report describ[ing] him as being able to do light work;" and (5) the findings of "State Agency doctors" who found him "not disabled."  (A.R. 25-26.)  These broad statements, taken together, led the ALJ to conclude that Ibarra-Montufar is not disabled, although out of deference to Ibarra-Montufar's disc disease and complaints of pain, he limited Ibarra-Montufar to modified sedentary work.  (Id. at 26.)

The problem with the ALJ's explanation is that it gives short shrift to Ibarra-Montufar's medical situation and avoids actual analysis.  While the ALJ supported his RFC conclusion with some findings, his analysis fails to mention a single doctor by name and, with few exceptions, neglects to pinpoint the evidence he relied upon. The ALJ's speedy assessment of Ibarra-Montufar's condition as "disc disease with lots of complaints of chronic pain," seems an oversimplification of a medical record that includes three spinal surgeries.  Further, the ALJ relied upon the 2008 Functional Capacity Evaluation as proof of Ibarra-Montufar's ability to perform light work in 2010, but at no time did he discuss for purposes of the RFC some of the limitations contained within that report, such as Ibarra-Montufar's immediate pain response to reaching overhead with both hands, or the "moderate to intense discomfort in the low back area" that he experienced throughout the evaluation, notwithstanding the spinal stimulator.  (A.R. 468.)  The ALJ seemingly attempted

18

to work around Ibarra-Montufar's functional limitations by giving him some "credit" for having chronic pain and disc disease, but giving credit is not the same thing as taking the time to understand the extent of the pain and the limitations it causes. *See Erwin v. Astrue*, No. 11 CV 1555, 2012 WL 3779036, at *8 (N.D. Ill. Aug. 30, 2012) ("Summarizing medical evidence is no substitute for actual analysis of medical evidence."); *see also Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (remanding case where ALJ improperly disregarded evidence of claimant's pain from pain-treatment procedures and the surgical implantation of a catheter and a spinal-cord stimulator).

Moreover, the ALJ glossed over the presence of the stimulator itself, except for a quick assertion that Ibarra-Montufar had a stimulator "installed for pain relief" and has "good control of pain symptoms on account of the spinal cord stimulator and various medications." (A.R at 25.) While this very likely is true, it seems important to bear in mind that the stimulator simply masks pain—it does not remove it or cure it. It seems clear that the stimulator allows Ibarra-Montufar to do things he would not be able to do without it—and this is probably alright—except for the fact that by masking his pain, it is possible for Ibarra-Montufar to exceed his back's limitations or to damage the stimulator in some fashion. This is not simply conjecture: Ibarra-Montufar's medical record indicates that in 2009 he bent over and dislodged the stimulator leads in his spine, causing the stimulator to fail and descending him into "intractable pain." (A.R. 503.) This pain was certainly alleviated by his second stimulator surgery—enough so that his surgeon noted

19

"good control" over his pain—but still this raises the question of what Ibarra-Montufar is capable of doing when his pain is essentially masked and he previously felt intractable pain. And then there is a notation in Dr. Kale's evaluation that Ibarra-Montufar had a "paravertebral muscle spasm." (Id. at 415.) It seems possible to this court that a spinal stimulator's ability to mask pain can create an illusion of greater well-being than is in fact the case. Perhaps the paravertebral muscle spasm Dr. Kale noted during his examination is proof of this point. This is at least an important consideration and one that warrants more of a discussion than was afforded by the ALJ.

In addition to speeding through his analysis, the ALJ also neglected to discuss Ibarra-Montufar's alleged physical and mental limitations, including his leg numbness, inability to reach, and confusion, or to analyze how these limitations would affect the RFC. The Commissioner argues that the ALJ implicitly factored in some of these limitations when he arrived at his sedentary work designation, but SSR 96-8p instructs that more is required of an ALJ, stating: "[w]ithout a careful consideration of an individual's functional capacities . . . the adjudicator may . . . overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do." SSR 96-8p at *4. Thus, while the court recognizes that sedentary work "represents a significantly restricted range of work" in deference to physical and mental impairments that cause "very serious functional limitations," SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996), an ALJ must still take the time to resolve conflicts between the medical evidence and the claimant's

testimony, *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). And so in this case, while it may be true that the ALJ implicitly addressed Ibarra-Montufar's need for an extremely non-exertional job environment, his determination did not minimally articulate how Ibarra-Montufar's inability to reach (for fear of dislodging his stimulator leads), the effects of his medications (confusion), or his leg numbness (caused by the stimulator) factored into the RFC determination. *See Steele*, 290 F.3d at 941. Furthermore, the ALJ may not rely on an absence of objective medical evidence to reject testimony, as he did with respect to Ibarra-Montufar's need to lie down. *See Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012) (noting that "[a]n ALJ may not reject a claimant's testimony about limitations on his daily activities solely because his testimony is unsupported by the medical evidence"). On remand, the ALJ will have the opportunity to "build a logical bridge from evidence to conclusion." *See Villano,* 556 F.3d at 562.

## C.      The ALJ's Credibility Determination

Next Ibarra-Montufar argues that the ALJ erred in assessing his credibility and in failing to consider a number of symptoms linked to his pain, including his need to lie down, leg numbness, need to avoid reaching, and mental confusion from his medications. This court affords an ALJ's credibility determination considerable deference and will only overturn it when it is "patently wrong." *Prochaska,* 454 F.3d at 738. That being said, it is the ALJ's responsibility to evaluate "the intensity, persistence, and functionally limiting effects of the [claimant's] symptoms . . . to determine the extent to which the symptoms affect the individual's ability to

21

do basic work activities." SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). When determining an individual's credibility, an ALJ "must consider the entire case record, including the objective medical evidence." *Id.* A claimant's description of the intensity and persistence of his pain "may not be disregarded solely because they are not substantiated by objective medical evidence." *Id.*

In this case, after summarizing the medical record but before analyzing the evidence, the ALJ made the following statement: "[a]fter careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual capacity assessment." (A.R. 25.) The Seventh Circuit repeatedly has criticized this very language as being meaningless. *See, e.g., Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). "Such boilerplate," the Seventh Circuit has stated, "fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (citation and quotations omitted). Additionally, this language has come under fire for referring to the "above residual functional capacity assessment" when in fact the assessment comes later in the opinion. *Filus*, 694 F.3d at 868. The determination of whether a claimant is able to work is often dependent on his credibility, and thus it is prejudicial to the claimant when a court flip-flops the analysis by determining the ability to work before

analyzing the claimant's credibility. *See Bjornson*, 671 F.3d at 645. The only exception to this rule is where the ALJ has otherwise explained his conclusion, in which case the inclusion of this language can be deemed harmless. *See Filus*, 694 F.3d at 868.

In this case, having resorted to incorporating template language into his decision, the ALJ then failed to adequately build a bridge from the evidence to his conclusion that Ibarra-Montufar can perform sedentary work. The ALJ believed Ibarra-Montufar's pain symptoms were not credible because his "allegations of pain and functional limitations are out of proportion to the objective medical findings and treatment notes which indicate good control of pain symptoms with the spinal cord stimulator and prescribed medications." (A.R. 25.) While this may ultimately prove to be the most reasonable conclusion, credibility determinations under SSR 96-7p require, among other things, consideration of a claimant's daily activities; an analysis of the dosage, effectiveness, and side-effects of medication; an inquiry into the frequency, intensity, and duration of pain; and an examination of functional restrictions. *See Trice v. Astrue*, 11 CV 1939, 2012 WL 5471089, at *14 (N.D. Ill., Nov. 9, 2012). The ALJ found Ibarra-Montufar's pain symptoms to be out of proportion with the medical evidence and treatment notes, but he did not reveal which medical evidence, notes, or medications he was referring to in arriving at this conclusion. Further, the ALJ discredited Ibarra-Montufar's need to lie down throughout the day on grounds that no medical evidence supports this allegation. But certain symptoms, including pain, "sometimes suggest a greater severity of

23

impairment than can be shown by objective medical evidence alone, [such that] the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence." SSR 96-7p at *1.  The ALJ was required to explain the inconsistencies between Ibarra-Montufar's activities of daily living, his complaints of pain, and the medical evidence, but he did not do so.  *See Villano,* 556 F.3d at 562 (holding that the ALJ erred by failing to analyze the factors required under SSR 96–7p, including whether the claimant's daily activities were consistent or inconsistent with the pain and limitations she claimed).  On remand, the ALJ will have an opportunity to engage in a fuller analysis of the evidence.

The court also notes that there are several instances where the ALJ overlooked evidence of Ibarra-Montufar's credibility.  The occupational and physical therapists who administered Ibarra-Montufar's Functional Capacity Evaluation in April 2008 noted that Ibarra-Montufar was cooperative, willing to attempt new activities or increased weights, and exerted maximum effort during the testing.  (A.R. 468.)  Similarly, when Dr. Kale examined Ibarra-Montufar in July 2009 at the request of the Commissioner, he found Ibarra-Montufar's "overall effort and cooperation [to be] excellent."  (Id. at 416.)  The ALJ does not mention this, or Ibarra-Montufar's work history.  Up to the date of his alleged disability, Ibarra-Montufar worked for 17 years as a warehouse picker, where he drove a forklift, loaded skids, picked up and moved medical supply materials, and lifted up to 60-70 pounds at a time.  (Id. at 139.)  The record indicates that although he experienced pain, he did not work fewer hours or change his job duties other than to restrict

24

lifting to 15 pounds. (Id. at 138.) Ibarra-Montufar took six to eight weeks off for his 2003 spinal fusion surgery, but then asked Dr. Adamson in 2004 to advise him as to when he could return to work. (Id. at 309.) Ibarra-Montufar also continued to work after his first two surgeries. (Id. at 138.) All of these facts support the conclusion that Ibarra-Montufar is a credible claimant. While ultimately it is the domain of the ALJ to determine Ibarra-Montufar's credibility, on remand he must avoid cherry-picking only such evidence as will support his ultimate conclusion. *See, e.g.*, *Denton*, 596 F.3d at 425 (finding that while an ALJ need not mention each piece of evidence or testimony, he cannot select and discuss only evidence that favors his ultimate conclusion) (citations omitted).

### D.     The ALJ's Reliance on the Functional Capacity Evaluation

In making his RFC assessment, the ALJ relied upon the April 2008 Functional Capacity Evaluation in concluding that Ibarra-Montufar is capable of light work. (A.R. 26.) Ibarra-Montufar contends that the ALJ erroneously relied on this report, mischaracterized its conclusions, and overlooked contrary evidence, including evidence of his diminished grip strength and the fact that the testing environment allowed him to take breaks as needed over the course of the four-hour evaluation. The court has already directed the ALJ to reanalyze the evidence pertaining to the RFC analysis. In so doing, the ALJ should review the Functional Capacity Evaluation anew to determine its relevance.

### E.     The ALJ's Step-Five Determination

Finally, Ibarra-Montufar maintains that he is unable to communicate in English and that the ALJ failed at step five to incorporate this limitation into the

hypothetical question posed to the VE.  The court disagrees.  "The ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible."  *Schmidt,* 496 F.3d at 845-46; *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009).  The record is replete with evidence that Ibarra-Montufar can communicate in English.  He spoke English at the disability hearing.  (A.R. 36-44.) He spoke English with his doctors.  He spoke English with Dr. Kale, who examined Ibarra-Montufar for purposes of the disability claim and noted that "[h]e is literate in Spanish but cannot write in English.  He was able to speak it adequately on todays' examination."  (Id at 413.)  There is nothing in the record to suggest Ibarra-Montufar is unable to communicate in English.  His English may not be sophisticated or complex, but he is understandable and able to express himself, as evidenced by the hearing testimony.

Finally, Ibarra-Montufar maintains that the ALJ should not have relied upon the VE's recommendations at all because the VE failed to understand the import of an at-will sit/stand option.  According to Ibarra-Montufar, the VE was asked:  "[a]nd if this person was unable to sit for six hours during an eight-hour workday, would these jobs remain?"  (Id. at 46.)  The VE responded in the affirmative:  "[w]ell, the job could be accommodated by standing, so if he could sit—five hours and stand for three, then . . . you still could do the job."  (Id.)  This answer, Ibarra-Montufar suggests, shows a failure to appreciate an at-will sit/stand option and thus destroys the VE's credibility.  But what Ibarra-Montufar does not tell the court is that the question at issue was posed by his own attorney, and thus the VE's answer was

merely a response to what Ibarra-Montufar's own counsel asked. Ibarra-Montufar's attorney did not ask the VE a question specifically addressing a sit/stand-at-will scenario, so naturally the response would likewise fail to discuss this option. Accordingly, the court finds this argument to be without merit.

### Conclusion

For the foregoing reasons, Ibarra-Montufar's motion for summary judgment is granted to the extent it seeks a remand for further proceedings.

**ENTER:**

_____

**Young B. Kim**
**United States Magistrate Judge**